UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                    )
                                          )
AIDA'S PARADISE, LLC,                     )        Case No. 6:12-bk-00189-KSJ
                                          )        Chapter 11
                    Debtor.               )
                                          )
_____  )

## MOTION FOR RELIEF FROM STAY

Creditor, T.D. BANK, N.A., successor by merger to MERCANTILE BANK, (the "Bank"),

by and through its undersigned counsel, hereby files this Motion for Relief from Stay, pursuant to

11 U.S.C. §362(d)(1) and (d)(2), and in support thereof states as follows:

### Summary of the Argument

Aida's Paradise, LLC's, (the "Debtor" or "APL"), Schedules, Statement of Financial

Affairs, and Case Summary depict a textbook bad faith filing. Among other things, the Debtor's

initial filings reflect *de minimus* income at the time of the bankruptcy filing, no equity in the

Debtor's single real estate asset, failed management of the property, no employees, little unsecured

debt, and effectively a classic two party dispute better situated for resolution in state court. The Case

Management Summary affirms that the Debtor's only hope for a "reorganization" is success under

its pending state court counterclaim, as the Debtor's $10,000 in monthly income barely services the

monthly expenses associated with the property, much less the approximate $9,000,000 in secured

debt. The legal principles favoring judicial economy and denouncing forum shopping dictate that the

state court action, which involves purely state court issues, ought to be concluded in the state court

forum. Indeed, prior to the filing, the parties were awaiting a ruling on a motion for summary

judgment, which could fully or partially resolve the matter. Relief from stay is appropriate to allow

the state court to render its decision and conclude the pending litigation.

## Colonial Bank Loan Documents

1.      On or about December 1, 2003, ADIL R. ELIAS and AIDA A. ELIAS (jointly, the "Borrowers") executed and delivered a Promissory Note in favor of Colonial Bank, N.A. ("Colonial Bank") and its successors and assigns in the principal amount of Five Million and 00/100 Dollars ($5,000,000.00).  On or about January 21, 2005, Borrowers executed and delivered an Amended and Restated Promissory Note in favor of Colonial Bank and its successors and assigns in the principal amount of Five Million Eight Hundred Seventy-Three Thousand Eight Hundred Five and 15/100 Dollars ($5,873,805.15) (the Promissory Note, as Amended and Restated, is referred to herein as the "Original Note").

2.      On or about December 1, 2003, the Borrowers executed that Certain Loan Agreement, which established additional terms and conditions of the loan from Colonial Bank to the Borrowers (the "Colonial Loan Agreement").

3.      Debtor is a corporation owned and operated by the Borrowers. On or about December 1, 2003, as security for the above-described Original Note, APL executed and delivered to Colonial Bank a Mortgage and Security Agreement encumbering the Property (as such term is defined in the Amended Complaint). On or about January 24th, 2005, APL executed that certain Notice of Future Advance and Mortgage Modification Agreement. The Mortgage and Security Agreement, modified by that certain Future Advance and Mortgage Modification Agreement, are referred to herein as the "Original Mortgage".

4.      On or about December 1, 2003, as security for the above-described Original Note, APL executed and delivered to Colonial Bank an Assignment of Leases, Rents and Contract Rights.

On July 24, 2004, APL executed that certain First Amendment to Assignment of Leases Rents and Contract Rights. The Assignment of Leases, Rents and Contract Rights, as amended, is referred to herein as the "Collateral Assignment".

5.       On or about December 1, 2003, APL executed an unconditional Guaranty in favor of Colonial Bank and its successors and assigns (the "Colonial Guaranty"). Pursuant to the terms of the Colonial Guaranty, APL agreed to be unconditionally liable for the due and punctual performance and payment of the all obligations of the Borrowers to Colonial Bank its successors and assigns.

6.       On or about December 1, 2003, as security for the above-described Original Note, UCC-1 Financing Statements in favor of Colonial Bank were recorded at Official Records Book 07213, Page 0627 in the Public Records of Orange County, Florida and filed with the Secretary of State on December 2, 2003, under record no. 200305581714 (the "Original UCC-1").

## The Mercantile Loan Documents

7.       Colonial Bank sold certain loans to Mercantile Bank (the "Bank") and assigned the applicable loan documents. Specifically, on or about October 27, 2006, Colonial Bank executed and delivered to the Bank an Assignment of Note, Mortgage Assignment, and Loan Documents (the "Mercantile Assignment"), a copy of which is attached hereto as **Exhibit "A."** The Mercantile Assignment assigned all right, title and interest in the Colonial Loan Agreement, Original Note, Original Mortgage, Collateral Assignment, Colonial Guaranty and Original UCC-1 to the Bank. *See* the Affidavit of Roderick B. Reimer, dated January 30, 2012, attached hereto as **Exhibit "B"** (the "Reimer Affidavit").

8.       On or about October 27, 2006, the Borrowers and Bank entered into that certain Loan

Agreement, which further set forth the terms of the Bank's loan to the Borrowers, and which was amended on September 29, 2008 by that certain First Amendment to Loan Agreement (collectively, the "First Loan Agreement"). A copy of the First Loan Agreement, as amended, is attached hereto as **Exhibit "C,"** and incorporated herein by this reference. *See* Reimer Affidavit.

9.      On or about October 27, 2006, Borrowers executed and delivered to Bank a Renewal Promissory Note in favor of Bank in the principal amount of Nine Million and No/100 Dollars ($9,000,000.00) (the "First Note"). A copy of the First Note is attached hereto as **Exhibit "D,"** and incorporated herein by this reference. *See* Reimer Affidavit.

10.      On or about October 27, 2006, as security for the above-described First Note, Debtor executed and delivered to the Bank a Mortgage and Assignment Modification and Restatement Agreement and Receipt for Future Advance (the "First Mortgage"), which was recorded on October 27, 2006, in Official Records Book 08940, Page 1971, of the Public Records of Orange County, Florida. A copy of the First Mortgage is attached hereto as **Exhibit "E,"** and incorporated herein by this reference. *See* Reimer Affidavit. The First Mortgage encumbers real property located on International Drive, in Orange County, Florida, more particularly described in the legal description contained in the First Mortgage (the "Property").

11.      On or about October 27, 2006, the Bank perfected its interest in the collateral owned by the Borrowers (the "Personal Property") by recording a UCC-1 Financing Statement in Book 08940, Page 1995, of the Public Records of Orange County, Florida, and filed with the Secretary of State on November 13, 2006, under record no. 20060411316X (the "First Mercantile UCC-1"). A true and correct copy of the recorded UCC-1, and description of the collateral is attached hereto as **Exhibit "F".**

12.    On or about October 27, 2006, Debtor executed a Continuing and Unconditional Guaranty in favor of the Bank (the "First Guaranty"). Pursuant to the terms of the First Guaranty, Debtor agreed to be absolutely and unconditionally liable for the prompt payment and performance of all obligations of the Borrowers to the Bank. A copy of the First Guaranty is attached hereto as **Exhibit "G,"** and incorporated herein by this reference. *See* Reimer Affidavit.

13.    On or about August 3, 2008, the Borrowers executed and delivered to the Bank a Renewal Promissory Note in favor of the Bank, in the principal amount of Four Hundred Ninety-Nine Thousand Five Hundred Seventy-Three and 01/100 Dollars ($499,573.01) (the "Second Note"). A copy of the Second Note is attached hereto as **Exhibit "H,"** and incorporated herein by this reference. *See* Reimer Affidavit.

14.    One or about August 3, 2008, the Borrowers and Bank entered into that certain Restated Loan Agreement, which further sets forth the terms of the Bank's loan to the Borrowers, (the "Second Loan Agreement"). A copy of the Second Loan Agreement is attached hereto as **Exhibit "I,"** and incorporated herein by this reference. *See* Reimer Affidavit.

15.    On or about September 25, 2008, Debtor executed a Continuing and Unconditional Guaranty in favor of the Bank (the "Second Guaranty"). Pursuant to the terms of the Second Guaranty, Debtor agreed to be absolutely and unconditionally liable for the prompt payment and performance of all obligations of the Borrowers to the Bank. A copy of the Second Guaranty is attached hereto as **Exhibit "J,"** and incorporated herein by this reference. *See* Reimer Affidavit.

16.    On or about September 29, 2008, as security for the above-described Second Note, Debtor executed and delivered to the Bank a Second Mortgage and Security Agreement (the "Second Mortgage"), which encumbers the Property. A copy of the Second Mortgage is attached hereto as

Exhibit **"K,"** and incorporated herein by this reference. *See* Reimer Affidavit.

17.     The documents referenced above are described collectively as the "Loan Documents."

### The Breach of the Notes, Loan Agreements and Guaranties

18.     Under the First Note and Second Note, the Borrowers were obligated to make monthly payments to Bank.   In February 1, 2009, the Borrowers failed to make the required payments due under the Loan Documents. *See* Reimer Affidavit.

19.     On March 3, 2009, pursuant to the First Mortgage, which assigned the rents, income and other benefits from the Property to the Bank, the Bank notified Debtor, the Borrowers and the tenants that they were directed to pay all future rent and other payments for use of the Property to the Bank (the "2009 Default Rent Assignment"). *See* Reimer Affidavit.

20.     The Bank has received payments directly from the Property's tenants since the 2009 Default Rent Assignment; however, the payments have been insufficient to satisfy the monthly principal and interest due to the Bank under the Loan Documents, as the Bank has been compelled to pay property taxes, insurance, utilities and other expenses for the Property when due in order to maintain the Property.   Payment of the taxes, insurance, utilities and other expenses are the Borrowers' obligation under the Loan Documents, but the rent proceeds have been insufficient to pay the loan payments, while also satisfying the monthly expenses necessary to maintain the Property. *See* Reimer Affidavit.

21.     Other defaults under the Loan Documents include: (1) Borrowers' failure to pay, when due, all insurance and taxes on the Property and Personal Property; and (2) Debtor's failure to provide the Bank with financial statements within forty-five (45) days after the close of APL's fiscal quarters. *See* Reimer Affidavit.

22.     On May 21, 2010, the Bank provided a Notice of Default to the Debtors.  To date, Debtors have failed to cure the default. *See* Reimer Affidavit.

23.     The Bank has accelerated all amounts due under the First and Second Notes, which, to date, have not been paid by the Debtors. *See* Reimer Affidavit.

### The State Court Action

24.     On or about July 21, 2010, Bank filed a state court action against Debtor, styled *Mercantile Bank, a division of Carolina First Bank v. Adil R. Elias, Aidaa A. Elias, and Aida's Paradise, LLC, et. al.,* in the Circuit Court for the Ninth Judicial Circuit, in and for Orange County, Florida (the "State Court"), Case No. 2010-CA-016620-O (the "State Court Action"), which included counts for breach of guaranty against the Debtor and foreclosure of the Property (the "Complaint").

25.     Debtor filed a counterclaim against the Bank, including counts for: (1) breach of fiduciary duty; (2) interference with a contractual relationship; (3) interference with advantageous business relationship; and (4) breach of implied covenant of good faith and fair dealing (the "Counterclaim"). The crux of the Counterclaim is that the Bank somehow beached the implied covenant of good faith and interfered with the Debtor's business relationship by accepting partial rents under the assignment of rents, by attempting to protect and preserve its collateral, and by allegedly conspiring to make a loan to an entity affiliated with the Debtor's tenant related to a separate restaurant at a different location on International Drive. As more thoroughly set forth in the Bank's Motion for Summary Judgment filed in the State Court Action, the Bank: (1) denies the existence of a fiduciary duty under Florida law between a lender and its borrower or guarantor, absent special circumstances which do not exist here; (2) maintains that the acceptance of partial rent

is legally inconsequential with respect to a commercial eviction action; (3) contends that it may lend to third parties related to separate projects without the permission or consent of its borrowers; and (4) notes that it caused no damage to the Personal Property, nor did the Bank direct any damage to be caused to the Personal Property.

26.    On August 21, 2011, the State Court considered Bank's Motion for Summary Judgment, which sought relief as to all counts under the Complaint, as amended, and denial of all counts contained in the Counterclaim (the "Summary Judgment Hearing"). The parties extensively briefed the legal issues prior to the Summary Judgment Hearing and the Court considered oral arguments by counsel for the parties. At the conclusion of the hearing, the State Court took the matter under advisement and requested the submission of proposed orders by the parties. *See* Court Minutes, dated August 12, 2011, a copy of which is attached hereto as **Exhibit "L."**

27.    On October 19, 2011, the State Court held a status conference and advised that the Court was still working on the order on the Motion for Summary Judgment and that a ruling would be forthcoming.

28.    Of significance, the above-captioned bankruptcy case was filed prior to the State Court's rendering of its ruling.

### The Bankruptcy Case

29.    After the Summary Judgment Hearing, but prior to the State Court's issuance of its ruling, Debtor initiated this bankruptcy case with the filing of a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Code. As set forth below, the Debtor's initial bankruptcy filings demonstrate that the Debtor's only hope for a "reorganization" is to prevail on its Counterclaim.

30.     For example, as reflected by the Debtor's schedules (Doc No. 25), the Debtor values the Property at $2,923,366, against which the Bank holds an approximate $9,000,000 claim.

31.     Aside from the single asset of real estate, the only other "assets" of the Debtor are two lawsuits, one against the Bank and one against a now defunct restaurant, which together the Debtor values at a staggering $12,000,000.

32.     Further, as acknowledged in the Debtor's Motion for Authority to Use Cash Collateral (Doc. No. 16), the Debtor's only income is approximately $10,000 per month, stemming from a donut shop on the Property. The Debtor's gross income has declined dramatically since 2010, with the loss of its anchor tenant, which tenant has not yet been replaced. *See* Statement of Financial Affairs (Doc. No. 25)

33.     According to the Debtor's Case Summary (Doc. No. 15), the Debtor has no employees.

34.     Lastly, the scheduled unsecured nonpriority claims total $17,500, excluding insider and disputed claims. This amount equates to a mere 0.2% of the secured debt.

**Grounds for Relief**

35.     As more thoroughly set forth below, pursuant to 11 U.S.C. 362(d), Bank is entitled to relief from stay for cause, including lack of adequate protection and because the filing was in bad faith. Relief from stay is also appropriate due to the lack of equity in the Property and because the Property is not necessary for an effective reorganization.

**11 U.S.C. 362(d)(1)**
***"For Cause"***

36.     11 U.S.C. 362(d)(1) mandates that relief from the automatic stay be granted "for

cause, including the lack of adequate protection of an interest in property of such party in interest

. . . ." 11 U.S.C. 361 states three methods by which adequate protection may be provided, none of

which are provided by the Debtor in this case.

37.     The "for cause" requirement can also be fulfilled if the filing was in bad faith. As

explained by the 11th Circuit in *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir. 1988),

a Chapter 11 petition may be dismissed or in the alternative the automatic stay may be terminated

for cause if a petition is filed in bad faith.

38.     The factors to be considered in determining whether a filing was in bad faith include:

A.     Whether the debtor only has one asset;

B.     Whether the debtor has few unsecured creditors whose claims are small in
relation to the claims of the secured creditors;

C.     Whether the Debtor has few employees;

D.     Whether the financial problems involve essentially a dispute between the
debtor and the secured creditors; and

E.     Whether the timing of the filing evidences an intent to delay or frustrate the
legitimate efforts of the secured creditors to enforce their rights.

*See Id.; See In re State Street Houses, Inc.,* 356 F.3d 1345, 1346 (11th Cir. 2004); *See In re: Davis*

*Heritage GP Holdings, LLC,* 443 B.R. 448 (Bankr. M.D. Fla. 2011); *See In re Joyce, Don &*

*Associates, Inc.,* 2008 WL 343265 (Bankr. M.D. Fla. 2008)(not reported in B.R.).

39.     In this instance, each factor is present:

A.     The Debtor's only asset, aside from alleged causes of action, is a single piece
of real estate;

B.     Excluding the disputed and insider debt, the Debtor has a *de minimus* amount
of unsecured debt, representing a scant 0.2% of the secured debt;

C.    The Debtor has no employees;

D.    The financial problems arise out of the debt owed to the Bank, a secured creditor; and,

E.    The timing of the filing prior to the issuance of the ruling on the Summary Judgment Motion evidences an intent to delay and frustrate the Bank.

40.    In addition to the classic factors outlined above, bad faith is further evidenced by the Debtor's unconcealed attempt to have the state law issues resolved in a different forum.  As stated in the Case Management Summary, paragraph 10, "[t]he Debtor intends to use this Chapter 11 proceeding to continue to prosecute its claims against Salt Island and Mercantile, respectively, as adversary proceedings."

41.    It is clear from the Debtor's Schedules and Statement of Financial Affairs that, with only $10,000 of income per month against approximately $9,000,000 in secured debt, success on the Counterclaim is the Debtor's only hope for a reorganization. Trying to extinguish $9,000,000 in secured debt with $10,000 of monthly income is a futile task.  In fact, the per diem under the First Note is $1,715.81, which interest eclipses, within a week, the income generated by the Debtor in a month.  Moreover, the Debtor has not identified any buyers, lenders, or investors in sight to help with the tremendous undertaking of satisfying a $9,000,000 debt with a Property the Debtor's value at $2,923,366.

42.    The Counterclaim could easily be resolved in the pending State Court Action, but the Debtor clearly prefers a new forum, as evidenced by this filing.  To promote judicial economy and to thwart forum shopping, relief from stay is appropriate so that the State Court can render its opinion and continue handling the pending litigation, which involves purely state law issues that the State Court is well-equipped to handle.

## 11 U.S.C. 362(d)(2)

43.    11 U.S.C. 362(d)(2) provides, in relevant part, that "the court shall grant relief

from the stay . . .with respect to a stay of an act against property . . . if (A) the debtor does not

have an equity in such property; and (B) such property is not necessary to an effective

reorganization . . . ." The two-part test is split as to the burden of proof as to each element: the

moving party must first prove that the debtor has no equity in the property and then the burden

shifts to the debtor to prove that the property is necessary to an effective reorganization. *See* 11

U.S.C. 362(g); *see also United Sav. Assoc. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365,

375-76 (1988).

44.    With respect to the lack of equity prong, the Debtor has conceded this point, as

reflected by its Case Summary and Schedules.  The issue, therefore, is whether the Property is

necessary for an effective reorganization.

45.    "For property to be 'necessary to an effective reorganization' of the debtor, within

the meaning of § 362(d)(2)(B), it must be demonstrated that an effective reorganization is

realistically possible; the mere fact that the property is indispensible [sic] to the debtor's survival

is insufficient." *In re Albany Partners, Ltd.*, 749 F.2d 670, 673 n. 7 (11th Cir. 1984) (affirming

bankruptcy court's lifting automatic stay as to real property based on a finding that the debtor

"had no realistic prospect of an effective reorganization."). It is the debtor's burden to present

competent evidence showing the possibility of an effective reorganization within a reasonable

period of time. *Acquisition Corp. of America v. FSLIC*, 96 B.R. 380, 383 (S.D. Fla. 1988).

46.    Generally, objections to the effectiveness of a reorganization fall into two

categories: "[1] feasibility flaws and [2] confirmability flaws." *In re Annicott Excellence, LLC,*

258 B.R. 278, 284 (Bankr. M.D. Fla. 2001) (Funk, J.). In this case, the possibility of the Debtor's

reorganization presents both types of flaws, as set forth below.

<u>Feasibility Flaws</u>

47.     In determining that a debtor's reorganization is not feasible for purposes of §

362(d)(2)(B), courts have considered a number of factors, including:

      (1)    the overwhelming amount of secured debt relative to amount of unsecured debt owed by the debtor, *In re Carco Partnership*, 113 B.R. 735, 740 (Bankr. M.D. Fla. 1990) (Proctor, J.);

      (2)    the presence of facts indicating the debtor's lack of good faith in filing its petition, *Albany Partners*, 749 F.2d at 674, *Acquisition Corp.*, 96 B.R. at 384;

      (3)    the debtor's failure to make a payment on secured debt since the date of default, *In re Country Club of Sarasota, Ltd.*, 13 B.R. 624, 626 (Bankr. M.D. Fla. 1981) (Paskay, J.)

      (4)    the debtor permitting the property to deteriorate, *id.*;

      (5)    the debtor having no funding or cash on hand to meet expenses, *In re Diplomat Electronics Corp.*, 82 B.R. 688, 691 (Bankr. S.D.N.Y. 1988).

      (6)    the absence of any potential investor to infuse "sufficient equity to reestablish the debtor[] as [a] going concern[,]" *id.* at 693;

      (7)    the debtor's lack of an income stream, *id.*;

48.     Here, each of the factors are present:

      a.    the unsecured debt is a small fraction of the secured debt (approximately 0.2%, if you exclude insider and disputed debt);

      b.    the timing of the filing prior to the State Court's rendering of a ruling on the pending Motion for Summary Judgment, the relatively minimal amount of unsecured debt, and the fact that the debtor has no employees are all indicative of a bad faith filing;

c.    the Debtor has been in default under the Guaranty for over a year;

d.    the Debtor has been unable to lease the anchor tenant space or miniature golf course to new tenants;

e.    the Debtor had no cash on hand at the time of the filing and generates only $10,000 a month in income, which would be insufficient to service even an interest only payment at a rate of 2%, without even considering the various expenses, which absorb a substantial portion, if not all, of the rental income;

f.    the Debtor has identified no potential investors to infuse capital into the Debtor; and,

g.    the Debtor's Schedules reflect sharply decreasing income over the last three years, with minimal current income.

49.    In light of the Debtor's inability to fully lease the Property, the lack of equity in the Property, and the Debtor's inability to pay its expenses and its mortgage, a successful reorganization of the Debtor is neither feasible nor realistic. Thus, as a matter of law, the Property is not necessary to an effective reorganization and the Bank should be granted relief from the stay.

<u>Confirmability Flaws</u>

50.    In determining that a debtor's reorganization is not confirmable for purposes of § 362(d)(2)(B), courts have analyzed primarily the requirements of § 1129 and the ability of the secured creditor to control the general unsecured class through its deficiency claim. *In re North Carver Pine Corp.*, 69 B.R. 616, 620-21 (Bankr. D. Mass. 1987) (secured deficiency claim in excess of $1.5 million versus remaining unsecured claims of only $285,688.72). For instance, if the secured creditor's deficiency claim can control the unsecured class and prevent confirmation, then reorganization is not possible and relief from the stay should be granted. *In re Woodridge North Apts.*, 71 B.R. 189, 190-91 (Bankr. N.D. Cal. 1987) (examining 1111(b) election giving secured creditor recourse, which allowed secured creditor to control unsecured class).

51.     As indicated in the Debtor's Schedules, Bank is effectively, from a confirmation perspective, the only creditor of the Debtor. The total of undisputed, non-insider unsecured claims total $17,500 relative to the Bank secured claim of approximately $9,000,000.  Assuming a cramdown plan, Bank would have a substantial unsecured claim which would have to be determined based upon a valuation of the Property, which deficiency should be properly classified with the other unsecured claims. *See John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (granting relief from stay because plan improperly classified undersecured deficiency claim to "mold" voting), *In re North Wash. Ctr. Ltd. Partnership*, 165 B.R. 805, 809-10 (Bankr. D. Md. 1994) (same). Under even the highest realistic valuation of the Property, the Bank would control the unsecured class given the amount of its claim and could prevent that impaired class from accepting the plan, thereby making cramdown untenable.

52.     Since confirmation of a reorganization plan would not be possible (absent consent by Bank, which it does not provide), reorganization cannot occur making the Property not necessary to an effective reorganization.  Therefore, relief from stay should be granted.

## Conclusion

53.     As evidenced by the Debtor's own papers filed with this Court, this bankruptcy case represents a classic bad faith filing. The Debtor has no equity in the Property, little cash on hand, minimal cash flow, no employees, and is embroiled in a two party dispute with its secured lender. Any reorganization of the Debtor is neither feasible nor realistic, thereby rendering the Property not necessary to an effective reorganization.  Moreover, to prevent forum shopping and to promote judicial economy, relief from stay is appropriate.

WHEREFORE, Bank respectfully requests this Court enter an order granting it relief from

the automatic stay to pursue its rights *in rem* against the Property and not *in personam* against the

Debtor and for such other and further relief as is just and proper under the circumstances of this case.

Respectfully submitted,

*/s/ Ryan E. Davis*
Ryan E. Davis, Esq.
Florida Bar No.: 0179851
Richard B. Weinman, Esq.
Florida Bar No.: 0231370
Winderweedle, Haines, Ward
& Woodman, P.A.
390 N. Orange Avenue, Suite 1500
Orlando, FL 32801
Telephone: (407) 423-4246
Facsimile: (407) 423-7014
rweinman@whww.com
rdavis@whww.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of January, 2012 a true and correct copy of the foregoing has been furnished via Electronic Transmission and/or via United States First Class mail to:

R. Scott Shuker, Esq., Latham Shuker Eden & Beaudine LLP, Post Office Box 3353, Orlando, FL 32802;

Christopher R Thompson, Esq., Lathan,Shuker,Eden & Beaudine, LLP, 111 N. Magnolia Avenue, Suite 1400, Orlando, FL 32801;

Miriam G Suarez, United States Trustee, 135 West Central Blvd., Suite 620, Orlando, FL 32801;

U.S. Trustee, 135 W. Central Blvd., Suite 620, Orlando, FL 32801;

Aida's Paradise, LLC, 2450 Maitland Center Pkwy., Ste. 300, Maitland, FL 32751; and

All Creditors and Parties of Interest, pursuant to Local Rule 1007-2, listed on the mailing matrix attached hereto (exhibits available upon request to Bank's counsel).

*/s/ Ryan E. Davis*

Label Matrix for local noticing
113A-6
Case 6:12-bk-00189-KSJ
Middle District of Florida
Orlando
Mon Jan 30 15:23:08 EST 2012

Carlos P. Moreno
2105 Mosher Dr.
Orlando, FL 32810-4407

Clement Electric
120 Spring Lake Hills Dr
Altamonte Springs, FL 32714-3423

Cuhaci Peterson
1925 Prospect Ave.
Orlando, FL 32814-6358

Evans Engineering
719 Irma Ave.
Orlando, FL 32803-3804

Jennifer Donuts
7440 International Drive
Orlando, FL 32819-8234

Ronical Int'l Trading
2450 Maitland Center Parkway
Ste. 300
Maitland, FL 32751-4140

Roy Law Firm
1003 Orienta Ave.
Altamonte Springs, FL 32701-5058

S.I Restaurant (I-Drive) LLC
10713 Lake Louisa Rd.
Clermont, FL 34711-8965

Scherer Construction &
Engineering of Central FL
2909 Fairgreen St.
Orlando, FL 32803-5043

TD Bank, NA, f/k/a Mercantile Bank
c/0 Richard B. Weinman, Esq.
Winderweedle Haines Ward & Woodman, PA
390 N. Orange Avenue, Suite 1500
Orlando, FL 32801-1658

End of Label Matrix
Mailable recipients    10
Bypassed recipients     0
Total                  10