UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| AIDA'S PARADISE, LLC, | ) | Case No. 6:12-bk-00189-KSJ |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |

## MOTION TO STRIKE, OR IN THE ALTERNATIVE DISMISS, DEBTOR'S MOTION TO EQUITABLY SUBORDINATE UNSECURED CLAIM OF TD BANK, N.A.

Creditor, T.D. BANK, N.A., successor by merger to MERCANTILE BANK, (the "Bank"), by and through its undersigned counsel, hereby files this Motion to Strike, or in the alternative Dismiss, Debtor's *Motion to Equitably Subordinate Unsecured Claim of TD Bank, N.A.* (the "*Subordination Motion*" or "*Motion*") (Doc. No. 69), pursuant to Rules 7012(f) and (b)(6), Fed. R. Bankr. P., and as grounds therefor states as follows:

### Summary of Argument

The *Subordination Motion* hinges upon the novel premise that a bank may not exercise its valid, existing, and lawful rights and remedies under its loan documents. The *Motion's* allegations are inconsistent with the concept of equitable subordination and are otherwise immaterial, impertinent, or legally inconsequential. For example, the doctrine of equitable subordination requires, among other things, domination and control of the Debtor, yet the *Motion* emphasizes the fact that, after a default, the Debtor refused to execute a forbearance because its principals believed it to be "unreasonable." If the Bank could not convince the Debtor to execute a forbearance agreement, it certainly could not dominate or control the Debtor's will, spirit, or actions.

What stands out most about the *Motion* is what is missing from it. For example, the *Motion* asserts that the Bank collected rents under an Assignment of Rents "after the Debtor had cured all then existing monetary defaults," but neglects to attach the loan documents, which permit the Bank's collection of rents after a default, even if the default is later cured. Notably, the Debtor does not allege that it had cured all defaults under the loan documents, which would have been inaccurate.

In addition to the payment defaults, the Debtor was delinquent in paying 2008 real property taxes and in providing quarterly financial statements to the Bank, both of which were required under the loan documents.  The *Motion* also fails to attach any agreements requiring the Bank's approval of future tenants or creating an obligation on behalf of the Bank to execute non-disturbance agreements. Nonetheless, the Debtor contends that the Bank's lien should be subordinated because the Bank refused to take such actions, even though the Debtor had defaulted under the loans, even though the loans had been accelerated and even though a lawsuit had been filed.

The Debtor's allegation that the Bank's acceptance of partial rent frustrated and delayed the Debtor's ability to evict Salt Island is untenable. The commercial lease statute provides that the acceptance of full rent, not partial rent, waives the right to evict.

Lastly, the Debtor alleges that the Bank directed Salt Island to remove valuable furniture, fixture and equipment from the Debtor's restaurant, and in doing so, it "greatly damaged the restaurant, diminished its value, and reduced the Debtor's ability to find a new restaurant tenant." Despite making this contention, the Debtor fails to attach the letter from TD Bank, which simply requests that its collateral be placed in secured storage.  The letter does not in any way direct or instruct Salt Island to damage or destroy the premises.  To the extent Salt Island caused damage, the cause of action would be against Salt Island, not the Bank.

What is most remarkable about this case is that any action or inaction by the Bank would have resulted in a similar motion or counterclaim. For example, had the Bank formally approved the eviction of Salt Island or approved the new tenant, the Debtor would have simply used that as a basis to delay foreclosure, contending that its inability to pay the mortgage is excused by the Bank's approval of its course of conduct.  In sum, the Debtor's allegations have no legal bearing or consequence, thereby making them impertinent, immaterial, and subject to dismissal or striking.

### Background

1.      In October 2006, Adil and Aida Elias (the "Borrowers") executed and delivered to Bank a renewal promissory note in the principal amount of $9,000,000, secured by a Mortgage and

Assignment Modification and Restatement Agreement and Receipt for Future Advance (the "First Mortgage"), which was recorded in the public records of Orange County, Florida. The First Mortgage encumbers real property located on International Drive, in Orange County, Florida, more particularly described in the legal description contained in the First Mortgage (the "Property").

2.      On or about August 3, 2008, the Borrowers executed and delivered to the Bank a Renewal Promissory Note in favor of the Bank, in the principal amount of Four Hundred Ninety-Nine Thousand Five Hundred Seventy-Three and 01/100 Dollars ($499,573.01) (the "Second Note").

3.      On or about September 29, 2008, as security for the above-described Second Note, Debtor executed and delivered to the Bank a Second Mortgage and Security Agreement (the "Second Mortgage"), which encumbers the Property.

4.      Debtor unconditionally guarantied the obligations to the Bank.

**The Breach of the Notes, Loan Agreements and Guaranties**

5.      Under the First Note and Second Note, the Borrowers were obligated to make monthly payments to Bank. The Debtors acknowledges, in paragraph 14 of the *Motion,* that the Debtor and its principals defaulted under the payment obligation by February of 2009.

6.      After the payment defaults, on March 3, 2009, pursuant to the assignment of rents provision in the First Mortgage, the Bank notified Debtor, the Borrowers and the tenants to direct all future rent and other payments for use of the Property to the Bank.

7.      Even though a default had occurred, the Debtor refused to execute a forbearance agreement, as acknowledged in paragraph 18 of the *Motion*. Although the *Motion* contends that the Borrowers temporarily cured the payment default, the *Motion* does not allege that all covenant defaults had been cured, which would have been false as the Debtor had not paid its 2008 real property taxes by March 1, 2009, or produced financial information as required by the loan documents.

8.      Notably, the *Motion* does not attach or cite to the loan documents, which expressly permit the continuation of the assignment of rents once a default occurs, even if the default is later

cured. The *Motion* simply contends that it was improper for the Bank to enforce its rights under the loan documents, even though an admitted default had occurred and even though the Debtor's anchor tenant was only paying partial rent.

## The Subordination Motion

9.     The *Subordination Motion* seeks to subordinate the Bank's unsecured deficiency claim based upon the following allegations, each of which is immaterial, inconsistent with the doctrine of subordination, or legally irrelevant:

> a.     that the Bank improperly refused to lift the Assignment of Rents;
>
> b.     that the Bank delayed the Debtor's ability to evict Salt Island through its acceptance of partial rent from the tenant and by not consenting to the eviction;
>
> c.     that the Bank requested that the Debtor execute a forbearance agreement after the Borrower's defaulted under the loan documents;
>
> d.     that the Bank improperly requested that its collateral be placed in secured storage at the time when Salt Island was vacating the premises;
>
> e.     that the Bank unreasonably refused to execute a non-disturbance agreement related to the prospective Rothman's lease; and
>
> f.     that the Bank improperly loaned money to a separate restaurant owned by the owners of Salt Island.

As set forth more thoroughly below, the allegations, even if true, do not form the basis for equitable subordination. The allegations do not reflect a situation where the Bank exerted direct control over and dominated the Debtor, such as through stock ownership, board membership, or contractual management rights or a situation where the Bank became the *alter ego* of the Debtor or had a "merger of identity."  Instead, the allegations reflect:

> a.     a debtor that defaulted under its loan documents;
>
> b.     a creditor exercising its ordinary rights and remedies under its loan documents; and
>
> c.     a debtor managing its own affairs through:
>
>> (1)     its refusal to execute a forbearance agreement;
>>
>> (2)     forcing its anchor tenant out of the premises; and

       (3)     negotiating with new tenants.

Although the *Motion* contends that the Debtor sought approval from the Bank with respect to certain of these actions, the *Motion* neglects to attach or cite to any loan documents, or case law, requiring the Bank's approval. This is because such approval was unnecessary, as the Debtor at all times managed its own affairs and continues to manage its own affairs.

**Memorandum of Law**

10.    As more thoroughly set forth below, this contested matter should be disposed of without further consideration via the standards provided by Rules 12(f) and 12(b)(6), respectively. The allegations contained in the *Motion* are immaterial, inconsistent with a cause of action for equitable subordination, and legally inconsequential.

**I.    Standards for Striking or Dismissal**

11.    A motion to strike pursuant to Rule 12(f) should be granted if the subject pleading contains "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Rule 12(f), Fed. R. Civ. P (as incorporated by Rule 7012, Fed. R. Bankr. P.). Striking a pleading is within the Court's discretion and is appropriate when "the allegations have no possible relation to the controversy, may confuse the issues, or may cause prejudice to one of the parties." *Fine's Gallery, LLC v. From Eur. to You, Inc.*, 2011 U.S. Dist. LEXIS 132257, *2 (M.D. Fla. 2011) (striking affirmative defenses that were not supported by a sufficient factual basis to establish plausible defense). As discussed below, the *Motion* contains factual allegations that are irrelevant and insufficient for equitable subordination. Therefore, the *Motion*, or at least certain allegations, should be stricken.

12.    Furthermore, a motion to strike a pleading in its entirety may be properly considered a motion to dismiss that is evaluated under the standards of Rule 12(b)(6), Fed. R. Civ. P (as incorporated by Rule 7012, Fed. R. Bankr. P.). *See Kermanj v. Goldstein*, 401 Fed. Appx. 458, 459 n. 1 (11th Cir. 2010) (affirming order granting motion to strike entire complaint). To properly plead a claim for relief, the Debtor must show "more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[W]here the well-pleaded facts do no permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown –that the pleader is entitled to relief .'" *Id.* at 679 (quoting Rule 8(a)(2), Fed. R. Civ. P.). The claim must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (internal quotations omitted). Thus, dismissal of a claim for relief is appropriate "when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Harbour E. Dev., Ltd. v. 7935 NBV, LLC (In re Harbour E. Dev., Ltd.)*, 2011 Bankr. LEXIS 4544, *14 (Bankr. S.D. Fla. 2011) (Cristol, J.) (quoting *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)) (dismissing, pursuant to *Iqbal*, debtor's request for equitable subordination against non-insider, non-fiduciary claimant because "there are no allegations of egregious conduct . . . ."). As a matter of law, the *Motion* is insufficient to state a claim for equitable subordination and this contested matter should be dismissed.

## II.    Equitable Subordination is an extraordinary remedy, rarely applied to creditors.

13.    Equitable Subordination is an "extraordinary remedy" only available under certain circumstances. *See Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 29 B.R. 139, 165 (Bankr. E.D.N.Y 1983). Before the Court may exercise its subordination power, certain conditions must be satisfied: (1) The claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or confer an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *See id.* at 168. "The overwhelming majority of subordination cases involve the claim of fiduciaries." *See id.* For example, courts have subordinated the claims of shareholders, officers and directors of bankrupt companies where the claimants were found to have engaged in fraud, mismanagement, self-dealing or other breaches of trust.

14.    Although subordination is not limited to insiders, where the claimant is a non-insider,

"egregious conduct must be proven with particularity.  It is insufficient for the objectant in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to "fraud, overreaching or spoiliation to the detriment of others."" *See id.* quoting *In re WT Grant Co.,* 4 B.R. 53, 74-75 (Bankr. S.D.N.Y. 1980), aff'd, 20 B.R. 186, (S.D.N.Y 1982), aff'd, 699 F.2d 599 (2d Cir. 1983).

15.    A creditor is not ordinarily a fiduciary of the debtor and owes the debtor no special obligation of fidelity in collection of its claim.  *See WT Grant Co.*, 699 F.2d at 609-610.  In fact, a creditor typically has an unconditional right to call a loan when due, to refuse to extend a loan for any cause or no cause at all, and to lawfully enforce collection.  *See id.*; *see also In re: Prima Co.*, 98 F.2d 952, 965 (7th Cir. 1938).  A creditor may be considered a fiduciary in the rare circumstance where a creditor exercises such a degree of control over the decision making process of the debtor that it amounts to a domination of the debtor's will.  *See id.*;  *see also* 699 F.2d at 610.

16.    In the rare cases where courts have found such domination or control over the debtor by the creditor, the creditor typically had acquired direct control over the debtor.  For example, in *In re American Lumber*, 5 B.R. 470 (D. Minn. 1980), the bank: (1) possessed a controlling interest in debtor's stock pledged as collateral  in the event of default; (2) refused to honor debtor's payroll checks; and (3) forced termination of  most employees, required drastic reduction of officer salaries, coerced execution of security agreements on remaining assets, among other things.  In other words, in that case,  the bank managed the debtor by making payroll decisions, by terminating certain employees, and by securing otherwise unencumbered assets.  *See also Fruehauf Corporation v. T.E. Mercer Trucking Company (In re T.E. Mercer Trucking Company),* 16 B.R. 176 (Bankr. N.D. Tx. 1981 (finding that creditor was an alter ego of the debtor where the creditor had contractual rights to place its designees on the board, to have one of its employees manage the day-to-day operations, and to exercise veto power on any items whatsoever, among other things).  Likewise, in *In re Process-Manz Press, Inc.*, 236 F. Supp. 333 (N.D.  Ill. 1964), the creditor held a pledge of substantially all of the debtor's common stock.  There,  the court found the control over the debtor

so pervasive that the creditor was in "substance the owner" of the bankrupt and therefore a fiduciary.

17.     By contrast, in the *In re: Prima Case*, the debtor's acquiescence as to the bank's recommendation to hire a particular manager was insufficient to constitute a domination of its will, even though the bank threatened to call its outstanding loans in the event the debtor failed to comply. *See* 98 F.2d at 965. The court reasoned that, because the bank was a non-fiduciary, its threat to call the outstanding loan did not amount to overreaching but rather was the lawful exercise of a legal right. *Id.*

18.     In analyzing the aforementioned cases, the *Teltronics Services*. court concluded that a non-insider creditor will be held to a fiduciary standard "only where his ability to command the debtor's obedience to his policy directives are so overwhelming that there has been, to some extent, a merger of identity. Unless the creditor has become, in effect, the *alter ego* of the debtor, he will not be held to an ethical duty in excess of the morals of the marketplace." 29 B.R. at 171. In that case, the court did not find that the creditor exerted any direct control over the debtor, as it owned no stock, had no contractual right to participate in management, and shared no common officers or directors with the debtor.

19.     Importantly, the court also did not find indirect control over the debtor even though the creditor sent letters to the lessees of the debtor notifying them to make payment to the creditor for rent. *See id.* at 167.

20.     Similarly, in this case, the Bank did not own any stock of the Debtor, had no contractual right to participate in management, and shared no common officers or directors with the Debtor, nor have such allegations even been made. "There is nothing inherently wrong with the creditor carefully monitoring his debtor's financial situation... or with suggesting what course of action the debtor ought to follow." *Id.*

**III.     The Debtor's allegations, even if accepted as true, do not evidence a fiduciary relationship or constitute the egregious type of conduct requisite for subordination.**

21.     In examining the allegations contained within the *Subordination Motion*, it is apparent that the Debtor has not alleged that the Bank in any way dominated the Debtor's will. Instead, at all

times relevant hereto, the Debtor had control over and managed its affairs and the Subordination *Motion* contains no allegations to the contrary.

     **A.**     **Bank's enforcement of its loan documents, including the assignment of rents, is not a basis for subordination.**

22.     The Debtor claims that the Bank should have lifted the Assignment of Rents, even though the Debtor, admittedly, defaulted under the loan documents and refused to execute a forbearance agreement.  While the Debtor carefully alleges a temporary cure of the payment default, it fails to allege a cure of all breaches under the loan documents. In reality, the Debtor had failed to pay its 2008 real property taxes by March 1, 2009, or produce quarterly financial records, both of which were breaches under the loans.  In addition, the relevant loan documents, which the Debtor neglected to attach to the *Motion*, permit the continuation of the assignment of rents after a default occurs, even if the default is later cured.  The Bank's enforcement of its contractually agreed upon remedy cannot possibly qualify as the type of extraordinary, egregious behavior necessary to subordinate the Bank's debt. Indeed, the Debtor fails to cite to any case law that suggests a bank must lift an assignment of rents after a clear and undisputed default by the Debtor.

23.     The allegation regarding the Bank's acceptance of partial rent under the assignment of rents, while true, is legally inconsequential.  The acceptance of partial rent, in a commercial lease setting, does not operate as a waiver of the landlord's right to evict.  Section 83.202, *Florida Statutes*, makes this clear: "[a]cceptance of the *full* amount of rent, with knowledge of a tenant's breach of the lease by non-payment shall be considered a waiver."  (emphasis added).  The statute only provides that acceptance of full rent, rather than partial rent, constitutes a waiver.  As such, the Debtor's allegation regarding the Bank's acceptance of partial rent should be stricken.

24.     The Debtor further contends that the Bank, by letter dated March 14, 2010, prevented the Debtor from evicting Salt Island by demanding that the Debtor place $1,200,000 in escrow prior to the eviction. Notably, the Debtor chose not to attach copy of the letter to the *Motion*. In reality, the Debtor always controlled the eviction decision and had the ability to evict, with or without the Bank's

approval. Indeed, the Debtor never assigned the lease to the Bank and the Debtor always maintained control over whether and when to evict. Without a reference or an attachment of a contractual provision demonstrating that the Bank actually controlled the Debtor's eviction decisions, which provision does not exist, the allegation is irrelevant and subject to being stricken.

**B.      The Debtor's refusal to execute a forbearance agreement demonstrates the Debtor's control over its affairs and undermines the subordination argument.**

25.      In the *Motion*, the Debtor claims that, after the Borrowers' default, it refused to execute a forbearance because it was "unreasonable." The fact that the Debtor refused to execute the agreement belies the contention that the Bank somehow dominated or controlled the Debtor. In this instance, the Bank was unable to have the Debtor even execute a forbearance agreement, so clearly the Debtor was in charge of and managing its own affairs. As evidenced by this allegation, the Bank did not have any direct control over the Debtor and certainly did not dominate its will. To the contrary, the Debtor managed its own affairs at all times and the Bank did nothing more than attempt to enforce its contractually agreed upon remedies.

**C.      The Bank's request to protect its collateral cannot be considered egregious conduct warranting subordination of its claim.**

26.      The Debtor contends that the Bank's unsecured claim should be subordinated because of alleged damage to the property caused by a former tenant. The Debtor does not contend that the Bank caused the damage, but rather the Debtor complains that the Bank sent a letter to the former tenant allegedly instructing it to do so. Notably, the Debtor did not attach a copy of the Bank's letter. The letter does not direct the former tenant to damage or destroy the premises; it simply requests that the Bank's collateral be placed in secured storage. To the extent the tenant damaged the restaurant or the personal property, the Debtor may have a cause of action against that tenant. To blame the Bank for any alleged damage based upon a purely innocuous letter is disingenuous, at best.

**D.      The Bank did not have any obligation to execute a non-disturbance agreement in favor of the prospective tenant.**

27.      The Debtor contends that the Bank, after the filing of the lawsuit, should have executed a non-disturbance agreement in favor of a "highly reputable proposed new tenant." Yet,

Page -10-

the Debtor fails to reference or attach any contracts or agreements with the Bank requiring its approval of prospective tenants or its execution of a non-disturbance agreement, which documents do not exist. As such, the Debtor's grievance is that the Bank refused to volunteer to waive certain rights under a non-disturbance agreement after the Debtor had defaulted under the Loan Documents, after the Debtor had previously refused to execute a forbearance agreement, and after the Bank had already initiated a lawsuit against the Debtor. Neither the loan documents nor the law impose such a duty or obligation upon the Bank.

28.    The case law on this issue is scant but supports the sensible proposition that a Bank does not have a duty to execute non-disturbance agreements under such circumstances. *See 641 Assocs. v. Balcor Real Estate Fin.*, 1993 Bankr. LEXIS 1191 (Bankr. E.D. Pa. 1993).

> The dearth of law supporting the right of a debtor-mortgagor to compel a mortgagee to execute a non-disturbance agreement would appear, in itself, antithetical to the Debtor's argument that such provisions are vital to reorganizations of single-asset realty-owner debtors. There are many cases of where such parties are debtors, and we would expect some caselaw on this issue to have developed if making such a demand upon a mortgagee were a common occurrence. Apparently, it is not.

*Id.* In *641 Assocs.*, the court refused to find that the lender was required to sign a non-disturbance agreement. *See id.*

29.    Similarly, in *In re Cottonwood Corners Phase V, LLC,* 2012 Bankr. LEXIS 550, 31-32 (Bankr. D.N.M. Feb. 17, 2012), the court found no duty to execute such an agreement. In *Cottonwood*, as here, the debtor argued that the equitable considerations weighed heavily in the debtor's favor because the lender breached its duty of good faith and fair dealing by refusing to execute a non-disturbance agreement to permit the debtor to re-let the property and instead intentionally made it impossible for tenants to occupy the property. *See id.* The debtor further contended it was tantamount to waste and a failure to mitigate damages. The *Cottonwood* court disagreed, finding that the lender "refused to execute [non-disturbance agreements] only after [the debtor] defaulted in its obligations to [lender], and after [lender] had accelerated the outstanding balance under the Note," after which "[the lender's] goal was to foreclose its lien as quickly as

possible." *Id.* Further, the court recognized that there was no obligation of the lender within the loan documents to approve non-disturbance agreements, and no evidence was presented by the debtor indicating that it was industry practice for lenders to execute non-disturbance agreements "after a loan has been accelerated and the lender is seeking foreclosure". *Id.* at *32.

30.    Lastly, adding the prospective tenant to the foreclosure action was appropriate since the prospective tenant may have had an interest in the premises. Otherwise, the tenant's interest, if any, could have survived foreclosure.  The fact that the Debtor negotiated the potential new lease further evidences that the Debtor was managing its affairs, which is inconsistent with the doctrine of equitable subordination.

   **E.    A lender's lending of money to a third party cannot constitute egregious conduct justifying subordination of its claim.**

31.    The Debtor contends that the Bank's claim ought to be subordinated because it allegedly knew that Salt Island's principals misdirected its loan proceeds to support a new restaurant known as Bogard's. Whether the Bank loaned money directly or indirectly to a separate business venture is immaterial. Banks are in the business of lending money. Absent restrictive covenants preventing a loan to a separate restaurant, which covenants did not exist here, the Bank was free to loan funds to some or all of the restaurants on International Drive, or Sand Lake Road for that matter. Following the Defendants' logic, every bank with respect to every loan would be required to analyze the relationship between its current borrower/client and any potential borrower to verify whether they were competitors or would otherwise adversely impact one another.  Absent an agreement to the contrary, the Bank was not prohibited from lending to other restaurants. Although outside of the purview of this type of *Motion*, the Bank also believes the allegation of misdirection to be simply fictitious given the timing of the funding of the Salt Island loan versus the timing of the opening of Bogard's.

**Conclusion**

32.    The Debtor's allegations, when considered as a whole, undermine the notion that the Debtor's will was somehow dominated by the Bank or that the Bank and the Debtor had a "merger

of identity."  Indeed, the Debtor: (1) refused to execute a forbearance agreement; (2) evicted its existing tenant; and (3) negotiated a potential lease with a prospective new tenant after the state court action had been filed.  In reality, the Debtor was not seeking the Bank's approval because it needed its approval, but rather to later use the Bank's approval as a defense in the foreclosure action.  In other words, irrespective of what position the Bank were to take, the Debtor was prepared, ready, willing and able to use that posture against the Bank at a later date.  However, what is evident is that the Debtor was always in control of its operations and has alleged absolutely no basis for equitable subordination.

WHEREFORE, the Bank respectfully requests that this Court strike, or in the alternative dismiss, the Debtor's *Motion to Equitably Subordinate Unsecured Claim of TD Bank, N.A.* and grant any other relief that this Court deems just and necessary.

Respectfully submitted,

*/s/ Ryan E. Davis*
Ryan E. Davis, Esq.
Florida Bar No.: 0179851
Richard B. Weinman, Esq.
Florida Bar No.: 0231370
Winderweedle, Haines, Ward
 & Woodman, P.A.
390 N. Orange Avenue, Suite 1500
Orlando, FL 32801
Telephone: (407) 423-4246
Facsimile: (407) 423-7014
rdavis@whww.com
rweinman@whww.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of April, 2012 a true and correct copy of the foregoing has been furnished:

**via Electronic Transmission to:**

R. Scott Shuker, Esq., Latham, Shuker, Eden & Beaudine LLP, Post Office Box 3353, Orlando, FL 32802

Christopher R. Thompson, Esq., Latham, Shuker, Eden & Beaudine, LLP, 111 N. Magnolia Avenue, Suite 1400, Orlando, FL 32801

Miriam G. Suarez, United States Trustee, 135 West Central Blvd., Suite 620, Orlando, FL 32801

**via United States First Class mail to:**

Aida's Paradise, LLC, 2450 Maitland Center Pkwy., Ste. 300, Maitland, FL 32751

*/s/ Ryan E. Davis*